We will start with our first case of the morning, United States v. John Joseph Price Jr. Good morning. My name is Candace Kane and I represent John Joseph Price, the defendant. I ask the court for three minutes rebuttal. That's granted. There are three reasons why the evidence should be suppressed in this warrantless search of a home. First, the government did not show that Debbie Fisher's original consent to search the home was voluntary. Number two, the government did not honor Debbie Fisher's request to stop the search. And number three, Debbie Fisher did not consent to the search of the locked basement and she had no authority to do so. The original search was not free and voluntary because of two things, deceit by the police and coercion. They show up with three officers and they call her home from work. What was deceitful about what the officers did? Well, first, they hid their true reason for wanting consent to search the house. They stated very openly that they wanted to search the house, search the basement and try to find a lab. That was at page 124 of the record. And they said that it was for the safety of the children that they wanted to go in and look around. But they already told her that her husband was in trouble or they told her that there was a problem with methamphetamine, didn't they? Right, and that was part of the ruse. I mean, they're telling her, oh, you know, you have no reason to worry in a sense. You know, your husband's been arrested and your boyfriend's... Why was that a ruse? It was true, wasn't it? He'd been arrested and they were... Well, it was to have her be relaxed. You know, we're coming home. We're only interested in the safety of the children. Yet they waited out there for 30 minutes for her to come home. They did not say they smelled any acute odors or anything that would let them believe that there was any sort of emergency or any sort of danger there. Don't we have a finding by the district court that this was an interaction which led to entirely voluntary acquiescence? Right. I disagree with the court's finding. I'm asking this court, too, to find that there was error in that finding. Well, we can't just disagree. It has to be clear error. Right. Right. And that comes from the facts of the case, which are that they waited for 30 minutes and that it was shown that the packaged material was not dangerous and that they let the kids go in the house and get what they wanted. There was no real danger. In addition, the most important thing is that the police did not honor Debbie Fisher's request to stop the search, and instead they pressed on to the basement. Once they were in the house, they asked for a key to or if she had a key to the bedroom. She had that. Then they asked her to unlock it. She unlocks it. She finds they see these pipes in an open drawer and then start opening other drawers and see a white powder. The officer says at that time, oh, well, we have now probable cause to charge you with manufacturing methamphetamine. Didn't she then request that they not continue the search of the main house? Well, that's in dispute. The factual record is not quite as clear. Although the agent claimed that she limited her request to stop the search to just the upstairs part, you really have to wonder because after she realizes she's in trouble and she says stop searching, and that comes clear on page 142 and 143 of the record of the appendix. The agent's asked, she didn't want you looking around anymore, did she? And the agent says yes. Now, the agent said stop searching the house part. Then he testified. She said stop searching the drawers. Then he testified. She said stop searching the upstairs. That's right. Can we draw from the confusing nature of his testimony that she really meant stop searching altogether? Absolutely. And especially when you combine that with the cost examination by trial counsel where he asked the agent, it's clear that she wanted you to stop looking because she knew she was in trouble. And he says, okay, yes. That's at page 143. Counsel, the police did stop searching, didn't they, in the house part? They never stopped. As soon as she said I want you to stop searching, you know, I'm in trouble now, they immediately said, you know, where's the basement? Can we get into the basement? How do we get to the basement? Okay, but they no longer searched in if you consider that, hypothetically, that the basement is different than the house part. They didn't search the house part anymore, right? They didn't inquire. Are you telling us, counsel, she can't then give consent to search another part of the house like the basement? Or once she says that's it, they have to just walk away? I think the police have to honor her request to stop the search. But can she reopen it with another consent? I suppose theoretically one could. However, in this case in particular, there was no break. As soon as she said she didn't want them to search, they immediately started pursuing the basement. And, in fact, it's interesting. At that point where he says how do we get to the basement, it's obvious. He didn't know that the basement had to be accessed by the outside. He came up with, I believe, this house parts testimony only after he got outside and realized that there were these two entrances, one to the basement and one to the upstairs. What's the evidence of coercion with respect to the new consent for the basement? Well, they go around to the outside. It's sort of a mixture or it's a combination, rather, of coercion and baby step questions by the police, which were deceitful, especially when you consider that they had these consent forms in the car, or some officers did, and they could have showed her or would have warned her about this, but they didn't. But, anyway, the coercion at the basement door, there are two officers or three officers at that point out the door, at least two, and they ask her is there any way to get in? Can we get in? And then, finally, she says, as long as you don't damage the door. Now, at this point, she knows that she's in big trouble because of that powder that was found upstairs, and I think at this point any reasonable person would think, you know, I'm in trouble, maybe I should go along. I don't think it was the free and voluntary consent that was envisioned by the United States Supreme Court. Did she have the ability to consent to the basement? Absolutely not. When we see this contrast with the upstairs, the locked bedroom, she has a key. In the basement, she has no key. There's nothing more clear, and it should have been clear to the officers, too, that she did not have common authority for that basement. Also, it's interesting. Before you go off that point, though, she didn't have the key. I read the record, and maybe you can clarify it for me. I don't think she said, I don't have any key anywhere. She just didn't happen to have the key at that point. Now, I've got my car keys on me, but I can get them. Right. I think she said only Mr. Price had the key for it. Exactly. On page 118 of the record, of the transcript, I mean of the record rather than the appendix. Depending on how you take that. It says, she said, this is according to the agent, I don't have a key. Only Mr. Price has the key. And so I think that that shows that only he had the key. In addition, most importantly, on page 147, the agent says that she said, Johnny lets me in sometimes. Johnny lets her in sometimes. Well, he lets her in to do the laundry, maybe get an occasional decoration. But it's not free access. It's not common authority. And it wasn't reasonable under these circumstances for the police to believe that she had the authority. All right. Now, ultimately, they go on. They file, prepare an affidavit and go and get a warrant. Yes. So how does that not then make everything okay under the inevitable or independent source doctrine? Well, there's two reasons. One would be a policy reason is that when you combine consent with inevitable discovery in the search of a home, basically what's left of the Fourth Amendment. But in particular in this case, without the basement, if you take out all of the material, all the contraband stated in the affidavit to the search warrant from the basement, this is what you're left with. Two pipes which the trial judge said were used for ingestion. That would be one to believe, personal use. Some plastic baggies with residue. I don't know that that necessarily means delivery or manufacturing. Are you looking at Appendix 63, I guess, Paragraph 12? I'm sorry. Yes. Paragraph 12, Page 63. And there's no mention there of the chemical which was what the officers told her was problematic because that meant manufacture. Is that correct? Exactly. Yes. There's no mention in the affidavit to the search warrant of that sodium hypophosphate. And there's also no mention of any of this amorphous source information that they testified to. So all you're left with in that search warrant are the two pipes, the baggies with residue, some pH paper, which, you know, he ran an auto body shop. Maybe there's a reason for him to have one, have a pH paper for that. There were no reports of any acute odors, no surveillance by the police. It's too thin a warrant to allow the search of a home. Is the pH paper for use or for manufacture? The police said it was for manufacturing. Where is that referenced in the affidavit? I don't know if it's referenced in the affidavit. That's right. I don't think it is. I don't think it is. So you're saying that once you take out the basement information, the affidavit doesn't hold up. No, there's hardly anything left. It's only evidence of personal use, basically. And so it wouldn't allow for the search of a home. Plus, they had no other... Would you combine that with the agent having purchased methamphetamine from Mr. Price? Well, that was mentioned in the affidavit. But, Your Honor, that was over two years before he was arrested and before the search. That was in April of 2002. That's right, April 5th, 2002. And he wasn't really arrested until October 5th, 2004. So it's literally two and a half years later. So it's stale, I would say. And also, that charge was eventually dismissed. Well, that hardly bears on the judgment to be made by the magistrate on the application for a warrant, does it? Right, but it is only an arrest. Yes. Or it is only an allegation, I'm sorry, at that point. It wasn't even an arrest because the arrest warrant for that charge wasn't even sought until February of 2004, just a few months before he was arrested. So it's really that allegation is just that, an accusation by an officer. So you think the issuance of a search warrant was unreasonable under those circumstances? A search warrant of a home, yes, absolutely. Now, the affidavit also says that he eluded authorities until October of 2004,  but then it says upon his arrest he was found to be in possession of items indicative of methamphetamine trafficking, including plastic baggies with methamphetamine residue and pH papers used to gauge the acidity of the production process. Would that have supplied sufficient cause for a warrant to search his home? Well, the officer says that that's what it was used for, but a neutral magistrate might consider the fact that he had an auto body shop and that there was an innocent explanation for having such papers, and I don't know that such papers necessarily lead to a conclusion of manufacturing. I mean, many of us, I mean, anybody can have pH paper. It's a science project material. It's not contraband. Well, there are other things there. I mean, the totality would point possibly in one direction. It's a pretty slim piece of evidence to base the search of a home on when you have also evidence, strong evidence of simply personal use, the pipes with the residue or the baggies with the residue. And just to allow a search of a home based on pH paper, which has innocent uses, is just not sufficient. All right. We'll hear from you on rebuttal. Thank you. Thank you. May it please the Court. My name is Rebecca Haywood. I'm here on behalf of the United States of America, and I ask that you affirm the district court's judgment in this case. I think it's important to realize and talk about first what the district court found in this case. The district court judge was the party that listened to the officer's testimony, and with regard to the voluntary nature of the initial consent to search in this case, heard the officers and specifically found that the consent to enter the home was voluntary. May I tell you what concerns me most about that matter? You want to address it now or later, I don't care, but I just want to focus it for you. The district court's finding that it was reasonable for the agent to conclude that Ms. Fisher had apparent authority to admit him to the basement. I find rather troublesome a locked basement, which the agent was advised. She occasionally got permission from her husband to go down and do the laundry and get the Christmas decorations. I find that a little difficult to square with apparent authority to, sure, be my guest, go into the basement, just don't damage the door. I don't have a key, so you'll have to find your way into the door without breaking it. First of all, I think we have to remember this was a basement. The access to the basement was from the outside. So this is different from a basement that was locked and was inside the house. Why does that matter? Because you're certainly going to have a lock on the basement door to keep out intruders, as opposed to your wife. But she was kept out. Well, that's not necessarily clear from the record. What she stated was, I don't have a key, and she said she did laundry. Laundry is something that hopefully you're going to be doing on a regular basis. But he let me in to do laundry. He let me in, not I get the key and unlock the door myself to do laundry. But there was never any testimony that he kept her out whenever she asked to get in. The question is, was she ever denied access to this area of her home? And in Georgia v. Randolph, which is one of the most recent cases on authority, the Supreme Court said you have to think about societal expectations and consider who was giving the consent. This is, according to the officer's knowledge, Mr. Price's wife. Now, there is some confusion in the record as to whether they were actually married, but there's no dispute that Mr. Price referred to her as his spouse. They went to the property to speak to her to make sure the children were okay. And this is her home. This is the basement where she does laundry. And it wasn't just Christmas decorations. She stated other items were stored there in addition. And while there may have only been one key, the fact that he kept the key doesn't mean that she did not have the ability to access the basement whenever she needed to do so. But there's no evidence that she does have that ability. And isn't it up to the government to offer the proof that would support the search? Certainly it is the government's fourth burden. So if the government didn't get that testimony that, you know, she can actually get the key whenever she wants, et cetera, they're stuck with the fact that Johnny would let her in sometimes. Well, Johnny would let her in to do the laundry. Johnny did not exclude her from that area of the home. And, again, the question is we're talking about two different things. There's actual authority and apparent authority. You know, whether or not there was actual authority was not a question that the district court reached in this case, but the district court found that it was reasonable based on the circumstances to find that she had apparent authority. And whether or not the officer was actually correct in that assumption, the question is whether or not it was a reasonable one. And in this case, when the officers know she lives in the home, there are two children in the home, obviously creating laundry, there are reasons that she would be going into the home, it was reasonable for the officers to assume that she had the right to go into the basement and was not denied access. It's a question of the Supreme Court in Matlock, which was an actual authority case, that talks about privacy interests and the reasonableness of someone assuming the risk that someone who shares property would allow a search. It's hard for me to understand what Agent Shira could have concluded other than that Mrs. Fisher, the spouse, had authority to go to her husband and say, will you let me into the basement, can I have the key? And that would make him the gatekeeper, wouldn't it? Well, Agent Shira specifically testified, I don't know that he only has the key all the time. Mrs. Fisher stated to him that Mr. Price lets me in there. Sometimes. She obviously doesn't need to go into the basement, which is access from the outside of the house, all of the time. But there just simply isn't, in terms of whether the officers were reasonable in believing that she had the authority to consent, in light of her relationship to Mr. Price and in light of the nature of her activity in terms of going to the basement, it's the government position that there was apparent authority to allow Mr. Price to have them enter the basement. We don't have any real case law in our court. Lots of 8th, 10th, 6th, 7th Circuit cases. That is correct. And then moving to the independent source doctrine, even assuming that there wasn't apparent authority to allow the search of the basement, the warrant affidavit, as Your Honor noted, does specifically mention various things that would support a finding of probable cause, Illinois v. Gates. Probable cause is not an exacting standard. You have Mr. Price having made a previous sale of methamphetamine to Agent Shira. You have Mr. Price's arrest at a garage with baggies containing methamphetamine residue as well as pH papers that the agent notes are used during the manufacturing process. The government's position is that the initial entry to the bedroom was reasonable. At that time, the day the search warrant is being written, or the affidavit is being written, the officer is seeing pipes with methamphetamine residue in the bedroom. And that information considered in total would be sufficient to have supported the affidavit, even without the entry to the basement. But then the search of the bedroom would stand. That's correct. But then the basement is a different issue. That's correct. I mean, that is the government's position, that the officers that came to the property, even though there were numerous officers there, some of the officers stayed off-site so as not to intimidate Ms. Fisher when she came to the property. You know, I have a problem with the overall situation here. Instead of going and getting a warrant, which is what you're supposed to do, I mean, that is what these agents are supposed to do. They've got this information. They should go get a warrant and come and say, as compared to going and inching along with this poor woman, pulling her from work, telling her it's for your children's safety and, you know, not coercing consent, but certainly putting the situation, putting her in a situation where, you know, she's going to have to stand up to them and say, you know, get out of here, which isn't all that easy to do. Just from a policy matter, you know, this kind of search should be the exception, not the rule. Well, you know, Mr. Price was arrested at his garage, and he specifically asked the officers to go to the property. He said, my children are home alone. They're expecting me to come home. Would you please go there to make sure my children are okay? Yeah, well, but that's different from please go there and get my wife home from work and make sure she consents to a search. Well, that is true, but they did go to the property for a legitimate reason. And in the Shekhinoff case, the Supreme Court specifically noted that consent is a very valid investigative tool that officers use. It's a matter of policy. The Supreme Court has, in fact, stated that consent is something that is a good thing, consent when quickly obtained, and the officers were concerned, in fact. I mean, methamphetamine labs are something that are very dangerous. They had information that he had a lab at the house. You have two children at the house. You have his wife coming home to a house. It is something, if they could have quickly gotten consent to find out whether or not it was a dangerous situation, that's not something that's a bad thing as a matter of policy. So, you know, they weren't being deceptive whenever they told her they were concerned. They specifically said, your husband is under arrest. We have reason to believe that he is manufacturing methamphetamine at your house. We want to come in to search. They didn't say, as a ruse, we want to come in to look for some stolen property, although I guess there was a stolen item on the property as well. Are there any further questions? Thank you very much. All right, thank you. Just one final note. When Mr. Price was arrested and the police went back to the house, all of the reasons that the government just told you that they gave Mrs. Fisher or Debbie Fisher for why they should get in the house are the same reasons they could have told a magistrate.